# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br>c/o Legal Services Center of Harvard Law School<br>122 Boylston Street<br>Jamaica Plain, MA 02130 | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| CARLOS DEL TORO,<br>in his official capacity as Secretary of the Navy,<br>1000 Navy Pentagon<br>Washington, D.C. 20350-1000 | )<br>)<br>)<br>)<br>) |
| Defendant. | )<br>) |

Civil Action No. _____

**COMPLAINT**

## INTRODUCTION

1.      Plaintiff John Doe[1], a veteran of the United States Navy, brings this action seeking judicial review of Defendant Carlos Del Toro's February 28, 2023 decision to set aside the Naval Discharge Review Board's decision to award Mr. Doe an Honorable discharge, in violation of his rights under the Administrative Procedure Act (APA).

2.      Mr. Doe joined the Navy in 2009 and excelled during his early days in service. During that time, he earned fourteen meritorious awards, received excellent performance evaluations, and was placed in the Accelerated Advancement Program to facilitate his promotion to the rank of E-4.

3.      After two years of outstanding performance, Mr. Doe was raped in the summer of 2011.  As a result, he developed post-traumatic stress disorder (PTSD), depression, and alcohol

---

[1] Plaintiff John Doe has filed herewith a motion to proceed under pseudonym.

dependence.  Although Mr. Doe immediately began exhibiting symptoms of those conditions after the rape, his mental health issues went undiagnosed until 2013.

4.      Between September 2011 and June 2012, Mr. Doe silently grappled with his military sexual trauma (MST).  Mr. Doe was unequipped to handle this psychological burden, which caused him to behave erratically.  For his misconduct, Mr. Doe received sanctions in the form of non-judicial punishments (NJPs).  Subsequently, Mr. Doe was discharged from the Navy under "Other Than Honorable" conditions in June 2012.

5.      Medical experts familiar with Mr. Doe's case have since opined that the behaviors that led to his discharge were trauma responses resulting from his then untreated PTSD rather than premeditated misconduct.  Mr. Doe's command was unaware of the extent of Mr. Doe's underlying mental health condition at the time of his discharge, which caused his commanding officers to erroneously attribute his substance abuse and misconduct to poor judgment.

6.      After departing from the Navy, Mr. Doe struggled to secure employment, housing, and healthcare.  Despite these obstacles, Mr. Doe eventually obtained access to mental health care from the U.S. Department of Veterans Affairs (VA), and, with the help of VA, has since made tremendous strides in rehabilitating himself.  Currently, Mr. Doe is enrolled in a four-year undergraduate program in Massachusetts studying computer science.  He also is gainfully employed part-time with his local Veterans Services Office (VSO). However, due to his less than fully Honorable discharge status, Mr. Doe is still unable to access the GI Bill educational benefits that he earned over the course of his military service.

7.      In 2020, to gain access to educational financing and remove the stigma of his discharge, Mr. Doe petitioned the Naval Discharge Review Board (NDRB) for a discharge upgrade.

8.      Pursuant to 10 U.S.C. § 1553(a), the NDRB is empowered to correct military records, including character of discharges, on the basis of "propriety" and "equity."

9.      Mr. Doe asserted to the NDRB that he should have received an Honorable discharge because his undiagnosed, MST-induced PTSD mitigated and outweighed the conduct for which he was discharged.

10.     In response, the NDRB partially accepted Mr. Doe's position and upgraded his characterization of service one level to "General (Under Honorable Conditions)," but still one step below Honorable.

11.     Shortly after Mr. Doe received this decision from the NDRB, the U.S. Navy, acting through the Defendant, consented to a settlement agreement in resolution of a class action, *Manker v. Del Toro*. The *Manker* plaintiffs had alleged an unlawful pattern and practice by the Navy in adjudicating certain discharge upgrade petitions.

12.     The *Manker* Settlement required the NDRB to automatically reconsider discharge upgrade petitions filed by veterans—like Mr. Doe—who suffered from service-related mental health issues at the time of their discharge and whose discharge petitions had been denied in whole or in part by the NDRB.

13.     The *Manker* Settlement highlighted the NDRB's irregular application of the standards mandated by the Department of Defense's (DoD's) Hagel, Kurta, and Wilkie Memoranda (the "Hagel Memo," "Kurta Memo," and "Wilkie Memo")—a collective of administrative directives to DoD discharge review boards about how to adjudicate upgrade petitions from veterans who suffered mental health issues during their service.  The *Manker* Settlement obligates Defendant Del Toro, as well as the NDRB, to fully abide by the mandates of the Hagel, Kurta, and Wilkie Memoranda.

14.     As a designated beneficiary of the *Manker* Settlement, Mr. Doe resubmitted his petition for reconsideration in 2022.  Shortly thereafter, the NDRB properly granted Mr. Doe a fully Honorable discharge, relying on the opinion of a NDRB medical officer that Mr. Doe's mental health caused his misconduct.

15.     Two months later, Defendant Del Toro, *sua sponte,* notified Mr. Doe that he intended to exercise his Secretarial Review Authority (SRA) to reevaluate the Board's decision granting him an Honorable discharge.  In response, Mr. Doe submitted a personal statement describing the tremendously positive effect that the correction of his military record—affirming that his discharge from the Navy was Honorable—was already having on his life.

16.     Defendant Secretary Del Toro and the NDRB are required to review Mr. Doe's discharge upgrade application in accordance with 10 U.S.C. § 1553(a); 32 CFR §§ 70.9, 724.814, 724.806; the Hagel, Kurta, and Wilkie Memoranda; and the *Manker* Settlement.

17.      In February 2023, Defendant Del Toro set aside the ruling of the NDRB and reimposed on Mr. Doe a General (Under Honorable Conditions) characterization of service.

18.     Defendant Del Toro failed to consider key medical evidence and facts.  In doing so, Defendant Del Toro ignored or otherwise failed to abide by federal regulations, the Hagel, Kurta, and Wilkie Memoranda, the terms of the *Manker* Settlement, and other laws governing SRA adjudication.

19.     By failing to comply with the standards above, Defendant Del Toro abused his discretion and acted arbitrarily, capriciously, and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## PARTIES

20.     Plaintiff John Doe is a veteran of the Navy.  He is a citizen of the United States and resides in Massachusetts.

21.     Defendant Del Toro is the Secretary of the Navy and is named herein solely in his official capacity.  Defendant Del Toro and his delegates have the power to review and modify NDRB decisions in which he has an interest.  This authority is conferred by 10 U.S.C. § 1553 and 32 C.F.R. § 724.814.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Administrative Procedure Act, 5 U.S.C. § 706.

23.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1361, because this is an action to compel an officer or employee of the United States, Defendant Del Toro, to perform a duty owed to the Plaintiff, Mr. Doe.

24.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(C).  Plaintiff resides in the District of Massachusetts, no real property is involved in this action, and Defendant Del Toro is sued in his official capacity as an officer of the United States.

## LEGAL BACKGROUND

*Military Discharges*

25.     Upon discharge, military personnel receive a "Certificate of Release or Discharge from Active Duty" (DD 214) that describes that veteran's "Character of Service" using one of five categories.  The most commendable discharge is "Honorable," followed by the other "administrative" discharge categories: "General (Under Honorable Conditions)" (GUHC) and

"Other Than Honorable" (OTH).  The other category of discharges—Bad Conduct and Dishonorable—constitute the "punitive" discharges.  The DD 214 also contains an entry for "narrative reason for separation," which explains why the service member is separating from the military.

26.    A veteran's Character of Service affects his or her eligibility for various benefits and support services provided by VA, as well as benefits provided by states (*e.g.*, property tax exemptions, burial in state military cemeteries) and non-profit entities (*e.g.*, scholarships).

27.    Veterans with less than fully Honorable discharges are barred from accessing educational benefits through the G.I. Bill program.

28.    Private employers will often request to see a veteran's DD 214 during the hiring process.  Less than fully Honorable discharges can result in negative employment outcomes.  Ali R. Tayyeb & Jennifer Greenburg, *"Bad Papers": The Invisible and Increasing Costs of War for Excluded Veterans* 8 (2017), https://watson.brown.edu/costsofwar/files/cow/imce/papers/2017/Tayyeb%20Greenburg_Bad%20Papers%20.pdf.

***General Standards for Discharge Review***

29.    Following separation, a veteran may upgrade their military discharge status by requesting changes to the Character of Service and narrative reason for separation, as well as the separation and re-entry codes found on their Form DD 214.

30.    For example, a veteran who was improperly discharged under Other Than Honorable conditions may request an upgrade to General (Under Honorable Conditions) or fully Honorable, depending on the nature of their case.  A veteran may similarly request specific changes to the narrative reasons for their separation, separation codes, and re-entry codes.

31.    Veterans who wish to correct their military records must apply to the appropriate Discharge Review Board or Board of Correction for their branch of service.  For Navy veterans discharged within 15 years before the submission of their application, the Naval Discharge Review Board (NDRB) is the appropriate forum.

32.    Pursuant to 10 U.S.C. § 1553(a) and 32 C.F.R. § 70.9(a)-(c), the NDRB is empowered to direct changes to discharges on the basis of "propriety" and "equity."

33.    Beginning in 2014, after Mr. Doe's discharge in 2012, DoD recognized that less than fully Honorable discharges were assigned inequitably to veterans who suffered from mental health conditions—often undiagnosed—during their service.  The DoD responded to this injustice by promulgating a series of memoranda to advise service discharge review boards on how to assess upgrade cases brought by veterans whose mental health influenced the conduct that led to their discharge.

34.    The three memoranda relevant to Mr. Doe's case—the Hagel Memo, the Kurta Memo, and the Wilkie Memo—emphasize the need for adequate redress for veterans, who served their country, but whose less than fully Honorable discharges arose from misconduct caused by PTSD and/or MST.

35.    The three memoranda constitute mandatory guidance binding on Defendant Secretary Del Toro and the NDRB.

### *Secretarial Review Authority of NDRB Decisions*

36.    Pursuant to 10 U.S.C. § 1553 and 32 C.F.R. § 724.814, the Secretary of the Navy and his delegates may exercise Secretarial Review Authority (SRA) over any NDRB decision that interests that authority.

37.    The SRA, in rendering its decision, must comply with all terms of 32 C.F.R. §

724.814.

38.     32 C.F.R. §§ 724.814 (d)(2)(iv)(A)-(B) provide that, if the SRA rejects any material conclusion reached by the NDRB, the decisional document must address and include reasons for doing so.  The SRA must explain its reasons for deviating from NDRB conclusions on matters of equity in accordance with all provisions of 32 C.F.R. § 724.806(f).

39.     Under 32 C.F.R. § 724.806(f)(ii)(B), when the SRA issues a finding of fact that is contradicted by evidence in the record, it must "explain why the information relied upon was more persuasive than the information that was rejected."

40.     Under 32 C.F.R. § 724.806(f)(iii), where an applicant cites no procedural irregularities in the record, the SRA may only reject the position of an applicant regarding a particular issue when it either: (a) explains why it disagrees the principles set forth by the applicant; (b) explains why the principles cited by the applicant are irrelevant to their case; (c) explains why the issue is not a matter upon which a discharge upgrade may be granted; and, (d) explains why other factors function to preclude granting an upgrade.

41.     The SRA decisional document must also address and dispose of each argument raised by the applicant, even if that argument was not previously considered in the NDRB decision being reviewed.

### *The Hagel Memo*

42.     On September 3, 2014, then-Secretary of Defense Chuck Hagel issued mandatory guidance to the military record review boards.  By 2014, the DoD understood that many veterans served at a time when PTSD was unrecognized by military leadership and were discharged for poor conduct related to that affliction.  Secretary Hagel sought to provide justice for these veterans and increase their access to discharge review boards.  To achieve this, the Hagel Memo

provided a standard that could be consistently applied to discharge upgrade cases where veterans lacked formal documentation of their PTSD while serving but were later diagnosed with the condition.

43.     The Hagel Memo instructs the boards to consider that PTSD is often not diagnosed until "decades after service was completed."  Secretary Hagel recognized that, in cases of undiagnosed PTSD, service records alone may be insufficient to show a nexus between PTSD and "the misconduct underlying the service member's discharge."

44.      The Hagel Memo instructs the boards to give "special consideration" to discharge upgrade applications, like Mr. Doe's, that contain PTSD diagnoses by the Department of Veterans Affairs.  The Hagel Memo also states that when PTSD or related conditions "may be reasonably determined to have existed at the time of discharge, those conditions will be considered potential mitigating factors in the misconduct that caused the under other than honorable conditions characterization of service."

### The Kurta Memo

45.     On August 25, 2017, Rear Admiral A.M. Kurta, performing the duties of the Under Secretary of Defense for Personnel and Readiness, issued mandatory guidance to military review boards.  Building off of the Hagel Memo, Acting Secretary Kurta further codified discharge upgrade standards for cases involving previously undiagnosed mental health issues like MST.  Like the Hagel Memo, the Kurta Memo functions to ensure fundamental fairness in the adjudication of cases like Mr. Doe's.

46.     The Kurta Memo first notes that "invisible wounds. . . are some of the most difficult cases" and that "standards for review should rightly consider the unique nature of these cases."

47.     The Kurta Memo reiterates that in-service misconduct may be excused by experiences of sexual assault and mental health conditions, including PTSD.

48.     The Kurta Memo also advises that misconduct itself may be "evidence of . . . PTSD."

49.     The Kurta Memo provides a list of symptomatic behaviors associated with PTSD and related conditions, including: "deterioration in work performance; inability of the individual to conform their behavior to the expectations of a military environment; substance abuse; episodes of depression, panic attacks or anxiety without an identifiable cause; [and,] unexplained economic or social behavior changes."  The Kurta Memo states these behaviors support the inference that a veteran suffered from a mental health condition at the time of their discharge, requiring service discharge boards to give "special consideration" to upgrade applications like Mr. Doe's.

50.     The Kurta Memo advises the boards that "[m]ental health conditions, including PTSD . . . impact veterans in many intimate ways, are often undiagnosed or diagnosed years afterwards, and are frequently unreported," and that "[m]ental health conditions, including PTSD . . . inherently affect one's behaviors and choices causing veterans to think and behave differently than might otherwise be expected."

51.     The Kurta Memo also advises the boards that "[a]n Honorable discharge characterization does not require flawless military service," and that in cases of PTSD, "some significant misconduct [may] be sufficiently justified or outweighed by the facts and circumstances."

52.     The Kurta Memo further clarifies that, with respect to its guidance to military review boards considering requests by veterans to modify their discharge status, unless

otherwise indicated, its use of the term "discharge" included "the characterization, narrative reason, separation code, and re-enlistment code" pertaining to a veteran's discharge.

### The Wilkie Memo

53.     On July 25, 2018, then-Under Secretary of Defense for Personnel and Readiness Robert L. Wilkie issued additional mandatory guidance to all the discharge review boards.  The Hagel and Kurta Memos mandate board evaluation of psychological stressors that veterans faced during their service.  The Wilkie Memo expands the scope of review by requiring the board to additionally consider post-service conduct.

54.     To ensure "fundamental fairness" and equity, the Wilkie Memo provides veterans with the opportunity to supplement their discharge upgrade petitions with evidence of "rehabilitation" and "positive post-conviction conduct" since their separation.

55.     The Wilkie Memo instructs the boards to especially consider factors such as the applicant's mental health, victimhood status as a sexual assault survivor, positive post-service conduct, "character and reputation," "[m]eritorious service in government," and "evidence of rehabilitation."

### The Manker Settlement

56.     On March 2, 2018, Navy and Marine Corps veterans brought a class action against the Secretary of the Navy.  Complaint at 2, *Manker v. Del Toro*, No. 3:18-CV-372 (CSH) (D. Conn. Mar. 2, 2018).  The plaintiffs in *Manker* alleged that, in failing to meaningfully apply the Hagel and Kurta Memoranda, the NDRB unlawfully denied full upgrades to numerous veterans who were afflicted by PTSD, traumatic brain injury (TBI), or MST and received less than fully Honorable discharges.

57.     The class represented by the *Manker* plaintiffs were veterans of the Navy, Navy Reserve, Marine Corps, and Marine Corps Reserve who served after October 7, 2001, and were discharged under less than fully Honorable conditions for conduct attributable to in-service mental health issues.

58.     The *Manker* parties mutually consented to a settlement on September 16, 2021, and the terms of that proposed agreement were approved and incorporated into the District Court's final order on February 15, 2022.  The *Manker* Settlement required the NDRB to automatically reconsider all discharge upgrade decisions rendered on or after March 2, 2012 to veterans who had experienced symptoms indicative of PTSD, TBI, or MST at the time of their separation and received less than fully Honorable discharges.

59.     The *Manker* Settlement mandated procedural requirements for reconsideration of these "Special Cases."  The Board was required to provide each applicant with a five-part analysis of all four factors mandated by the Kurta Memo.  The Board must:

(a) respond to each of the applicant's contentions;

(b) describe the evidence on which it relied [in] consideration of each of the applicable Kurta Factors;

(c) explain why it decided against the veteran with respect to each applicable Kurta Factor;

(d) articulate a rational connection between facts found and conclusions drawn; and,

(e) distinguish any prior Board decisions cited by the applicant in accordance with applicable laws and regulations.

60.     Significantly for Mr. Doe's case, Section K of the *Manker* Settlement

states that the procedural standards demanded of the NDRB for Special Case reconsideration must also be followed in the exercise of SRA. Stipulation & Agreement of Settlement at 16-17, *Manker v. Del Toro*, No. 3:18-CV-372 (CSH) (D. Conn. Sep. 16, 2021).

61.     The Court approved the proposed settlement and declared that "the provisions of the Settlement Agreement are . . . incorporated into and designated as a part of the ORDER OF THIS COURT" and that the Court would "retain[] jurisdiction over [the] discontinued action, in the event that disputes arise over the implementation of the Settlement Agreement." *Manker v. Del Toro*, No. 3:18-CV-372 (CSH), at 15 (D. Conn. Feb. 15, 2022) (order approving class action settlement).

## FACTUAL ALLEGATIONS

62.     John Doe was born, raised, and currently resides in Massachusetts.

### Mr. Doe's Service in the U.S. Navy

63.     Mr. Doe enlisted in the U.S. Navy in 2009, at age 20.

64.     After completing basic training, Mr. Doe was stationed at Naval Base Coronado in San Diego, California, where he served as an Avionics Technician in a helicopter squadron.

65.     Mr. Doe excelled in his early days in the Navy. His first performance evaluation in July 2010 stated that he had "limitless potential" and that he "eagerly tackle[d] every job, producing excellent results." At this time, Mr. Doe consistently dedicated off-duty time to improving his skills, and, as a result, earned multiple additional awards and qualifications.

66.     Upon recommendation from his commanding officers, in August 2010, Mr. Doe was placed in the Accelerated Advancement Program to be advanced to E-4 rank.

67.    In February 2011, Mr. Doe received a performance commendation from the Commander of the Naval Air Force Pacific Fleet, who highlighted Mr. Doe's "exceptional professionalism, initiative and loyal dedication to duty."

68.    Soon after, Mr. Doe received his second performance evaluation, which described him as a "Tireless Professional" and "Outstanding Plane Captain."  He was then recommended for promotion to E-5 rank.

69.    In June 2011, Mr. Doe received his third performance evaluation.  He was found by his command to be "highly talented" and "extremely motivated."  He was "a model Sailor in every respect."

70.    One night, in or about July 2011, Mr. Doe was out drinking and became separated from his group of friends.  In the early hours of the next morning, he awoke undressed in an apartment while being anally raped by a fellow sailor.

71.    Mr. Doe fled the apartment and attempted to compose himself.  For months thereafter, he refused to speak of the assault and did not report it to either his command or the San Diego police.

72.    After the rape, Mr. Doe coped with his trauma by drinking.  As he noted in his May 8, 2012 personal statement to the NDRB, his previously casual alcohol consumption "became a necessity, a way to forget."  Under the psychological weight of the assault, in combination with his attempts to self-medicate, Mr. Doe fell into a deep depression.

73.    In September 2011, while on a cross-country trip with his commanding officer and two other crewmen, Mr. Doe drank alcohol at a stop in New Mexico.  When a fellow air crew member smelled alcohol on his breath the next morning, Mr. Doe was removed from his mission and sent back to his duty station.  He received a non-judicial punishment (NJP) of a six-

month suspended reduction in rank to E-3, forty-five days of extra duty, and forfeiture of half his base pay for two months.

74.     After the incident in New Mexico, Mr. Doe was referred to a Navy substance abuse rehabilitation program called "IMPACT." In October 2011, Mr. Doe was medically screened for treatment at Naval Medical Center San Diego (Balboa Naval Hospital) for his alcohol problems. There is no evidence that Mr. Doe received any such treatment before November 2011.

75.     In late October 2011, Mr. Doe hosted a Halloween party for fellow sailors at his on-base apartment. A group of men "crashed his party," and they proceeded to sexually assault and repeatedly harass one of Mr. Doe's female friends. Shortly after, Mr. Doe heard about the assault, experienced PTSD-induced flashbacks of his own rape, and became agitated. He asked the men who assaulted and harassed his friend to leave the party. The men refused. A melee broke out in which Mr. Doe struck the two men several times.

76.     A few days after the fight, Mr. Doe's room was searched. The synthetic cannabinoid known as "spice" was found, along with a smoking pipe.

77.     Mr. Doe was reduced in rank to E-3 because of the October fight. He lost his avionics technician position in his squadron and was assigned to base maintenance duties. Mr. Doe's command took no further action to facilitate Mr. Doe's admission to the IMPACT program or refer him to other substance abuse resources.

78.     By this point, Mr. Doe had been living with undiagnosed PTSD for at least three months. Like many others afflicted with PTSD, Mr. Doe faced uncontrollable aggression and anger, impulses to self-medicate, and feelings of worthlessness on a daily basis. Without

treatment, Mr. Doe lacked the capacity to manage those traumatic impulses in a stressful military environment.

79.     In November 2011, Mr. Doe was out drinking when a fellow sailor assaulted him, which triggered a PTSD impulse.  The other sailor left the room immediately after the assault. Mr. Doe "was angry and was not thinking," as he later recalled, and he punched holes in the sailor's wall and door while under the influence of alcohol.  The other sailor was charged with assaulting Mr. Doe under the Uniform Code of Military Justice (UCMJ) Article 128.  Mr. Doe was charged under UCMJ Article 109 with destruction of non-government property.

80.     Two days after, Mr. Doe met with his master chief petty officer to discuss the incident.  After the conversation, Mr. Doe's command referred him to the Substance Abuse and Rehabilitation Program (SARP) and recommended that he visit the hospital to detoxify him from alcohol.

81.     Mr. Doe felt that his life was spiraling out of control and decided to follow his master chief's advice to admit himself and enter SARP.  During his detox, Mr. Doe reported "feelings of guilt" and "feelings of worthlessness," but experienced only mild symptoms of alcohol withdrawal.

82.     A few days into treatment, Mr. Doe admitted himself to the hospital, reporting depression and suicidal ideation.  A clinical evaluation performed by a Navy psychiatrist in December 2011 found that "[Mr. Doe's responses for the 'PHQ-9' patient health assessment] reflect[ed] significant symptoms of depression" that would require "further evaluation in treatment."  Mr. Doe reported to the psychiatrist that "he ha[d] not had thoughts of suicide until recently when he started getting in trouble for alcohol problems."  The psychiatrist concluded that Mr. Doe "appear[ed] to have psychiatric symptoms."

83.     After this assessment, Mr. Doe made significant efforts to begin recovering from his substance abuse, although he still had not disclosed the rape.  He began residential treatment for his alcohol dependence through SARP.  As the patient with the most meritorious awards (fourteen) of any patient in his assigned rehabilitation team, Mr. Doe was twice elected to serve as a community leader during treatment and "was regarded as a role model by fellow patients," according to notes from his provider at Balboa Naval Hospital.

84.     In December 2011, five months after the rape, Mr. Doe received his fourth performance evaluation.  The evaluation referenced his NJP from October 2011, and, for the first time in his military career, Mr. Doe was found to be "below standards" in the "Military Bearing/Character," "Teamwork," and "Leadership" categories.  However, he continued to "meet standards" in "Professional Knowledge," "Quality of Work," "Command or Organizational Climate," and "Personal Job Accomplishment."

85.     Mr. Doe completed residential treatment with SARP and transitioned in January 2012 to an intensive outpatient program, Continuing Care.  As part of this treatment, Mr. Doe attended several Alcoholics Anonymous and self-help meetings per week.  Later that month, Mr. Doe celebrated his sixtieth day of sobriety with his therapy group.  He remained sober and continued attending three to seven self-help meetings per week for the next two months.

86.     For the remainder of Mr. Doe's service, he abstained from alcohol.  But Mr. Doe's PTSD, depression, and MST were left untreated.

87.     In March 2012, Mr. Doe reported worsening depression and suicidal thoughts. His SARP counselor immediately referred him to Balboa Naval Hospital, where he met with Navy psychiatrist CDR Bryn Reina.

88.     CDR Reina reported that, "only after much questioning and reassurance," Mr. Doe revealed—for the first time—that he was raped the previous summer.  Mr. Doe explained that he was "hiding behind alcohol" to avoid that trauma, and that he began to experience worsening symptoms of anxiety, depression, and PTSD after completing SARP, because sobriety required him to confront the trauma of his rape more directly.  Mr. Doe's recovery from alcohol abuse brought his deeper issues "to the surface."

89.     Mr. Doe credited his participation in Alcoholics Anonymous for prompting his disclosure of the sexual assault.  By this time, Mr. Doe had progressed to steps three and four of his rehabilitation, which encouraged honesty and transparency.

90.     CDR Reina reported that Mr. Doe exhibited "psychological factors of past abuse not dealt with."  She diagnosed Mr. Doe with depression and anxiety.  She also flagged Mr. Doe for PTSD—noting that a formal diagnosis would require more data.  This was the first time the Navy identified signs of Mr. Doe's PTSD.

91.     Having finally disclosed the rape, Mr. Doe met with a Sexual Assault Prevention and Response (SAPR) officer and decided to file a report for the assault with the San Diego Police Department, knowing that the report would be disclosed to his command.  Nothing ever came of this report, as no charges were ever filed against the perpetrator of the rape that occurred in or about July 2011.

92.      Although medical providers found that "[Mr. Doe's] prognosis for remaining free of alcohol-related incidents [was] considered good," the Navy initiated disciplinary and discharge proceedings against Mr. Doe in April 2012.  He was charged by his command for striking two other service members during the October 2011 fight and with wrongful possession of spice and drug paraphernalia.

93.     Mr. Doe's Navy Judge Advocate General (JAG) lawyer recommended to Mr. Doe's commanding officer that Mr. Doe should be discharged with a General (Under Honorable Conditions) characterization of service, submitting evidence of Mr. Doe's exemplary naval service before the rape.  CDR Reina offered to advise Mr. Doe's command that he should receive a General (Under Honorable Conditions) discharge to ensure that he could transition to receiving mental health treatment from VA.

94.     The recommended discharge characterization by the commanding officer of Mr. Doe's helicopter squadron is missing from Mr. Doe's Official Military Personnel File (OMPF). Diligent searches were made for it, including outreach to Mr. Doe's helicopter squadron in San Diego, the JAG officer who represented him in his discharge proceedings, and the Naval Personnel Record Center in Millington, Tennessee.  But that recommended discharge has never been located.

95.     The discharge recommendation of Mr. Doe's commanding officer was sent for review to the commanding officer of the Naval Air Force, Pacific Fleet.  On June 7, 2012, the Admiral in command of Naval Air Force, Pacific Fleet ordered Mr. Doe's administrative separation with an Other Than Honorable characterization of service.

96.     On June 19, 2012, according to Navy Military Personnel Manual Article 1900-808, Mr. Doe was given a physical examination to assess his medical condition for his pending discharge.  The examining physician was a flight surgeon, not a mental health professional.  He determined that Mr. Doe was "physically qualified for separation" with "no medical condition . . . that disqualifies [him] from the performance of [his] duties or warrants disability evaluation system processing."

97.     Mr. Doe visited Navy providers twelve days before this examination to receive treatment for his newly diagnosed anxiety and depression and to continue being screened for PTSD, but discussion of Mr. Doe's mental health is absent from the flight surgeon's medical discharge report.  It does not include a mental health evaluation—now mandatory for administrative discharges—and makes no reference to Mr. Doe's SARP evaluation of PTSD symptoms or CDR Reina's observations at Balboa Naval Hospital of Mr. Doe's PTSD symptoms.

98.     Mr. Doe was discharged from the Navy in June 2012, having been transformed, in approximately eleven months after his rape, from a "model sailor" to one stigmatized by an Other Than Honorable discharge.

***Mr. Doe's Life After Discharge***

99.     Upon discharge, Mr. Doe returned from San Diego to Massachusetts. He was unable to secure stable housing, temporarily living "with any of my friends and family who would let [him]," as he later recalled in his letter to the NDRB.

100.     With the assistance of a Massachusetts Veteran Service Officer in his hometown, Mr. Doe contacted HUD-Veterans Affairs Supportive Housing to apply for a housing voucher. Mr. Doe's application was approved, and he moved into permanent housing.

101.     Mr. Doe was initially employed as a manual laborer but struggled balancing his work and mental health, stating in his letter to the NDRB that "it was challenging to recall feelings and open up at [therapy] meetings, and then go to work and try my best not to reflect on those emotions and memories."  He left his first job on good terms and found employment elsewhere.  But his PTSD symptoms continued to limit his abilities to function normally in the workplace.

102.    Mr. Doe was hospitalized in 2013 after reporting suicidal ideation to VA.  At this point, he was officially diagnosed with PTSD, depression, and anxiety.  However, his OTH discharge barred him from receiving VA health care and related benefits, despite his lengthy period of exemplary naval service before the rape.

103.    Mr. Doe then applied to the VA for healthcare eligibility under certain VA regulations that permit OTH veterans, on a case-by-case basis, to receive care.  Mr. Doe compiled the application with assistance from his town's Veteran Service Officer.

104.    In 2016, VA found that Mr. Doe's service had been honorable for VA purposes, determined him to be eligible for healthcare, and provided him with a primary care doctor and access to mental health care.

105.    VA initially rated Mr. Doe as 60% disabled because of PTSD, depression, and anxiety.  In 2018, after numerous meetings with healthcare professionals and several appeals within VA, Mr. Doe was given a 100% disability rating for service-connected PTSD.

106.    In 2022, Mr. Doe began working part-time with his town's Veteran Service Officer.  In this role, Mr. Doe helps other local veterans to secure housing, access benefits, and become employed, having surmounted all those hurdles himself.

107.    With his housing and VA healthcare now secured, Mr. Doe decided to continue his post-discharge recovery by applying to college.  In 2022, Mr. Doe was accepted to and enrolled in a computer science program at a Boston-area four-year college, even though he was unable to access G.I. Bill education benefits due to his less than fully Honorable discharge.  Enrolling in college has substantially advanced his post-discharge recovery.  As Mr. Doe stated in a letter to the NDRB, "one of my biggest ambitions is to go to school and get a degree in computers, so I can be a programmer, a job which would fit well with my social limitations."

***Mr. Doe's Discharge Upgrade Application***

108.    Mr. Doe petitioned the NDRB for a discharge upgrade in September 2020. The petition recited the facts above, but also presented, for the first time, an expert mental health evaluation of Mr. Doe in February 2019, conducted by VA-trained psychologist Dr. Sandra A. Dixon, Psy.D.  Importantly, the evaluation concluded that "there [was] a clear nexus between [Mr. Doe's] mental health disorders and the conduct leading to discharge."

109.    In response to this first petition, the NDRB decided to upgrade Mr. Doe's discharge characterization to General (Under Honorable Conditions), while maintaining the narrative reason of In Lieu of Trial by Court Martial.

110.    The NDRB found that Mr. Doe's service was "honest and faithful," but did not issue a fully Honorable characterization of service because the Board found that "the severity of [Mr. Doe's] mental health status did not rise to a level to completely absolve him of the misconduct."  In its decision, the Board focused on Mr. Doe's two NJPs for alcohol-related infractions.

111.    As noted above, because Mr. Doe's case involves mental health conditions, namely PTSD and depression, he was notified in May 2022 that his discharge upgrade application would be automatically reconsidered pursuant to the *Manker* Settlement.

112.    Upon reconsideration under the *Manker* Settlement guidelines, a different NDRB panel in October 2022 unanimously awarded Mr. Doe a fully Honorable characterization of service and upgraded his narrative reason for separation to Secretarial Authority.  This decision panel, which included a medical professional, specifically found that "[Mr. Doe's] issues [of misconduct] were exacerbated by the Applicant's MST."

113.     The NDRB's award of an Honorable characterization of service recognized the excellence of Mr. Doe's service as an avionics technician before the MST assault and vindicated the sacrifices he made during his enlistment.  It removed the stigma associated with his discharge status and encouraged him to continue to rebuild his life.  Mr. Doe has enrolled in college to pursue a degree in computer science.  With a renewed sense of pride and connection to the military community, Mr. Doe also volunteers to deliver essential services to local veterans through a work-study program, in which he assists the Massachusetts Veteran Service Officer in his town with benefit claims of fellow veterans.  After a lengthy and often retraumatizing discharge upgrade process, Mr. Doe was able to find closure and obtain a fresh start because of the grant of an Honorable discharge.

114.     Then, in December 2022, Secretary Del Toro *sua sponte* informed Mr. Doe that, under his Secretarial Review authority, his Office had chosen to review the Board's decision to grant Mr. Doe an Honorable discharge.

115.     The Secretary explained to Mr. Doe that he "ha[d] the right to submit a rebuttal for [SRA] Review."  Mr. Doe did so.  In his rebuttal, Mr. Doe stated that the NDRB, in its post-*Manker* review, had adjudicated his upgrade correctly and lawfully to Honorable status.  Mr. Doe submitted a letter describing the personal significance of his Honorable discharge.  Mr. Doe expressed his gratitude and explained how the NDRB's decision had eliminated the stigma and injustice of his less than fully Honorable discharge.  Mr. Doe concluded by stating that, on the Fourth of July, he would "feel prouder than most" on account of his Honorable discharge.

116.     On February 28, 2023, the Secretary of the Navy set aside the decision of the NDRB and reinstated Mr. Doe's discharge record with a GUHC characterization of service.  The Secretary declared, in direct contradiction to the analysis of the NDRB and its medical advisor,

and in a conclusory manner, that "[Mr. Doe's] misconduct, especially assaulting fellow sailors, [is] egregious such that it outweighs any mitigation from MST and mental health conditions." The Secretary's decision deprived Mr. Doe of closure and forced him backward in rebuilding his life.

117.    In his decision, Secretary Del Toro failed to consider—or even mention—key evidence in the record, most notably the mental health evaluation report of Dr. Dixon and VA's diagnosis of PTSD and depressive disorder.  The Secretary failed to base his conclusory opinion on any medical analysis that related Mr. Doe's condition to his misconduct.  Specifically, the Secretary failed to consider Dr. Dixon's findings that "there [was] a clear nexus between [Mr. Doe's] mental health disorders and the conduct leading to discharge."

118.    In his decision, the Secretary failed to provide any evidence supporting his rejection of the NDRB's decision, reasoning, and supporting evidence, and similarly failed to adjudicate each contention raised by Mr. Doe, in violation of 32 CFR §§ 724.806; 814.

119.    In his decision, the Secretary failed to meaningfully apply "liberal consideration," as mandated by the Hagel Memo, to Mr. Doe's discharge upgrade application.

120.    In his decision, the Secretary failed to correctly apply the Kurta Factors but rather downplayed the severity of Mr. Doe's mental health conditions and improperly weighed the positive and negative aspects of his service.

121.    In his decision, the Secretary failed to correctly apply the standards in the Wilkie Memo for a discharge upgrade, by failing to grant relief on the basis of injustice and inequity.

122.    In his decision, the Secretary failed to correctly apply the standards of the *Manker* Settlement.

***Injury Suffered by Mr. Doe as a Result of the Secretary's Decision***

123.    Mr. Doe has been injured by the Secretary Del Toro's erroneous decision to set aside the NDRB's decision to award Mr. Doe an Honorable Character of Service.

124.    Because the Secretary improperly set aside the NDRB's decision, Mr. Doe remains ineligible for G.I. Bill educational benefits.  Mr. Doe is preparing for a career in software development and is currently attending college in pursuit of that goal.  Work as a computer programmer would allow Mr. Doe to work independently and avoid his prior experience of his PTSD symptoms interfering with his employment.  By stripping Mr. Doe of his Honorable discharge, Defendant Secretary Del Toro has denied Mr. Doe the financial assistance that he earned through his naval service.  Without G.I. Bill benefits, it will be difficult for Mr. Doe to pay for the education necessary to realize his professional ambitions.

125.    In addition, Mr. Doe's GUHC characterization of service is stigmatizing.  Such discharges are strongly correlated with higher rates of depression.  *See* Human Rights Watch, *Booted: Lack of Recourse for Wrongfully Discharged US Military Rape Survivors* (2016), https://www.hrw.org/report/2016/05/19/booted/lack-recourse-wrongfully-discharged-us-military-rape-survivors.  Mr. Doe has suffered from PTSD and depression since he was raped in 2012.  The shame brought about by the rape and his unjust discharge status continues to aggravate Mr. Doe's traumas and diminish his self-worth as a veteran.  Because Secretary Del Toro denied Mr. Doe his Honorable characterization of service, which relieved him of that stigma, Mr. Doe continues to suffer.

126.    Mr. Doe's current characterization of service also negatively impacts his employment prospects, forcing him to explain to future employers why his DD 214 shows a less than fully Honorable discharge.

127.    To remedy those injuries, Mr. Doe seeks the relief requested below.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Declaration of Plaintiff's Rights Under 28 U.S.C. § 2201(a)

128.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

129.    For the reasons stated above and below, Defendant has violated or otherwise failed to comply with the APA.

130.    Defendant's unlawful actions have injured and continue to injure Plaintiff in multiple ways.

131.    Plaintiff seeks a declaratory judgment regarding those injuries and violations.

### SECOND CLAIM FOR RELIEF
### Violation of The Administrative Procedure Act, 5 U.S.C. § 706

132.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

133.    Defendant's SRA decision to revoke Mr. Doe's discharge upgrade constitutes a final agency action.

#### A. Violation of 32 C.F.R. § 724.814 and 32 C.F.R. § 724.806

134.    Defendant, in his SRA decision, failed to consider, much less adequately respond, to the expert opinion of Dr. Dixon, which concluded that Mr. Doe's post-rape acts of misconduct should be considered trauma responses, rather than voluntary and intentional behaviors.

135.    Defendant similarly ignored the opinion of the NDRB medical officer who presided over Mr. Doe's *Manker* Settlement reconsideration, who, like Defendant Del Toro, had

access to Dr. Dixon's report and a full record of Mr. Doe's misconduct, and properly concluded that upgrading Mr. Doe's discharge to Honorable was "the most appropriate disposition."

136.    Defendant failed to identify the evidence upon which he relied in rejecting the NDRB's conclusion that no causal link existed between Mr. Doe's cognition and the misconduct for which he was discharged, much less explain why it was more persuasive than the evidence upon which the NDRB made its determination.

137.    Defendant, in determining that Mr. Doe was not entitled to a fully Honorable discharge on the basis of equity or clemency, ignored Mr. Doe's mental health, status as a sexual assault survivor, positive post-service conduct, "character and reputation," "[m]eritorious service in government," and "evidence of rehabilitation."  Instead, Defendant solely considered Mr. Doe's educational achievement since his separation from the Navy.

138.    Defendant failed to explain why he disagrees with the NDRB's conclusion that Mr. Doe's MST-induced mental health issues outweigh the misconduct for which he was discharged.

139.    Defendant failed to explain why Mr. Doe's contention that his MST-induced mental health issues outweigh the misconduct for which he was discharged is not relevant to the disposition of his case.

140.    Defendant failed to explain why Mr. Doe's contention that his MST-induced mental health issues outweigh the misconduct for which he was discharged is not a matter upon which discharge upgrades are granted.

141.    Defendant failed to explain why other factors in Mr. Doe's case preclude granting him relief on the basis that his MST-induced mental health issues outweigh the misconduct for which he was discharged.

142.    Including but not limited to the reasons stated above, the Defendant's failure to adequately address and dispose of all contentions presented by the NDRB and Mr. Doe, pursuant to 32 C.F.R. § 724.814 and 32 C.F.R. § 724.806, as prescribed by 10 U.S.C. § 1553 and the *Manker* Settlement, is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

**B. Violation of the Hagel, Kurta, and Wilkie Memoranda**

143.    Defendant failed to grant "liberal consideration," as required by the Hagel and Kurta Memoranda, to Mr. Doe's discharge upgrade petition, which was based on his MST-induced PTSD and related mental health conditions.

144.    Defendant ignored, or otherwise failed to properly consider, critical medical evidence establishing that Mr. Doe's misconduct in service were trauma responses caused by PTSD. As a result, Defendant improperly balanced Mr. Doe's misconduct against the mitigating effects of his MST-induced PTSD.

145.    Defendant ignored, or otherwise failed to properly consider, medical evidence showing that Mr. Doe's substance abuse issues represented "efforts to self-medicate symptoms" of MST-induced PTSD and depression.

146.    Defendant failed to adequately respond to all issues raised in Mr. Doe's discharge upgrade applications, namely his candor, his exemplary early service conduct, his recovery from substance dependence, his mental health rehabilitation, his 100% VA disability rating for PTSD and depression, his educational accomplishments, and other factors, as required by the Wilkie Memo.  This ground further supports relief under the Wilkie Memo.

147.    Defendant failed to articulate a rational connection between the evidence presented and his conclusion, which was contrary to that of the second NDRB decision, that Mr. Doe's MST-induced PTSD did not outweigh his misconduct.

148.    Including but not limited to the reasons stated above, Defendant's failure to properly apply the standards set forth in the Hagel, Kurta, and Wilkie Memoranda is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### C. Failure to Comply with Sections IV(D) and IV(K)(2) of the *Manker* Settlement

149.    As explained above, Mr. Doe is a class beneficiary of the *Manker* Settlement and was entitled to automatic reconsideration of his discharge application. Upon reconsideration, the second NDRB panel granted him an Honorable discharge.

150.    Defendant erroneously and unlawfully set aside the second NDRB panel's grant of an Honorable discharge to Mr. Doe, denying him the proper adjudication to which he was entitled under Sections IV(D) and IV(K)(2) of the Settlement and erroneously reinstating Mr. Doe's previously unjust discharge characterization.

151.    Defendant failed to identify the evidence, if any, on which it relied to conclude that Mr. Doe's discharge was not outweighed by his MST-induced mental health issues.

152.    Defendant failed to adequately respond to or rebut Mr. Doe's contention, supported by Dr. Dixon's expert opinion, that Mr. Doe's MST-induced mental health issues caused the misconduct, and therefore led to his less-than-Honorable discharge.

153.    Defendant failed to state a rational basis, or cite any evidence in the record, for his conclusion that Mr. Doe's misconduct during his naval service outweighed the effects of his MST-induced mental health conditions as a cause of that misconduct.

154.     Defendant's failure to adhere to the terms of the *Manker* Settlement and 32 C.F.R. § 724.814(d) is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

**D. Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution**

155.     The protections of the Due Process Clause of the Fifth Amendment of the U.S. Constitution require a federal administrative agency to follow its own regulations and sub-regulatory guidance in conducting its adjudications.

156.     Mr. Doe's liberty and property interests are affected by his Character of Service because it determines his eligibility for various material benefits, like G.I. Bill educational assistance, and bears directly upon his sacrifice and service to the United States, affecting his dignity and self-worth as a veteran.  Character of Service designations are known, understood, and easily procured by prospective employers.  Veterans who seek to challenge less than fully Honorable discharges, which convey stigmatizing and derogatory information, must be afforded elementary due process rights.

157.     Mr. Doe's GUHC discharge status casts a continuing stigma on Mr. Doe, deprecating him and his naval service.

158.     The Defendant is obligated to exercise his Secretarial Review Authority in compliance with the regulations and mandatory procedures set forth in the Administrative Procedure Act, the Hagel, Kurta, and Wilkie Memoranda, the *Manker* Settlement, 32 C.F.R. § 724.814, 32 C.F.R. § 724.806, and other laws and regulations, as provided above.

159.     In failing to adequately and properly support his conclusion that the equitable considerations of Mr. Doe's MST-induced mental health problems did not warrant a fully Honorable discharge, the Defendant, by not following such regulations and procedures, abridged

Mr. Doe's rights under the Due Process Clause of the Fifth Amendment in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(1)    A declaratory judgment stating that Defendant's decision to set aside Mr. Doe's Honorable discharge is contrary to law and therefore invalid, null, and void;

(2)    An order vacating Defendant's decision and reinstating the decision of the NDRB to award an Honorable Character of Service to Mr. Doe;

(3)    An order changing Mr. Doe's narrative reason of separation from Secretarial Authority to Completion of Active Service;

(4)    In the alternative, to remedy the ongoing injuries suffered by Plaintiff, an order vacating the Defendant's decision and remanding to the Defendant with instructions to review key evidence, such as Dr. Dixon's report and the medical officer's analysis from the second NDRB decision, comply with 32 C.F.R. § 724.814 and 32 C.F.R. § 724.806, properly apply the DoD standards for discharge relief in the Hagel, Kurta, and Wilkie Memoranda, and apply the standards of the *Manker* Settlement, in furtherance of the relief requested in Prayers (1) through(3) above;

(5)    An award of reasonable attorneys' fees and costs to Plaintiff; and,

(6)    A grant of any other relief that the Court deems just, equitable, and proper.

Dated: December 15, 2023       Respectfully submitted,

/s/ Daniel L. Nagin
Daniel L. Nagin BBO#601058
Dana Montalto BBO#687436
John J. Regan BBO#415120
Gene Young Chang*
Attorneys for Plaintiff
VETERANS LEGAL CLINIC
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
 (617) 390-2737
dnagin@law.harvard.edu


*law student appearance certification pending