## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:23-cv-13112-JEK |
| ) | |
| TERENCE G. EMMERT, in his official ) | |
| capacity as Acting Secretary of the Navy,[1] ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER ON THE PARTIES'
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**KOBICK, J.**

In 2011, two years after enlisting in the Navy, plaintiff John Doe[2] suffered military sexual

trauma ("MST") when he was raped by a fellow sailor. Doe subsequently developed posttraumatic

stress disorder ("PTSD"), and he began to self-medicate with alcohol. In the months following the

assault, Doe was sanctioned for being drunk on duty and charged with physically assaulting two

sailors during a fight at a party. Within a year, Doe was discharged under Other Than Honorable

Conditions. In 2020, Doe submitted a discharge upgrade application to the Naval Discharge

Review Board ("NDRB" or "Board"), arguing that his service-related MST and PTSD mitigated

and outweighed the misconduct that resulted in his discharge. In 2022, the NDRB unanimously

voted to award Doe an Honorable discharge, but the Director of the Navy Council of Review

Boards, whom the Secretary of the Navy had designated as the NDRB's Secretarial Review

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current Acting Secretary of the Navy, Terence G. Emmert, is substituted as the defendant in this action.

[2] The Court previously allowed Doe's motion for leave to proceed under a pseudonym. ECF 12.

Authority ("SRA"), reversed the Board's decision in part. The SRA concluded that Doe's conduct toward the sailors he assaulted was egregious and that he should receive only a partial upgrade to an Under Honorable Conditions discharge, rather than an Honorable discharge.

Doe then filed this suit against the Secretary of the Navy, in his official capacity, alleging that the SRA's decision to reverse the Board was arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Pending before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Court concludes that the SRA's decision was arbitrary and capricious because the SRA failed to explain why he concluded that aggravating factors—namely, the fact that Doe physically assaulted fellow sailors—outweigh mitigating factors expressly raised by Doe in this case, such that Doe is not entitled to an Honorable discharge. The Court disagrees with Doe's contentions that the SRA's decision was arbitrary and capricious because it did not comply with a prior settlement agreement entered into by the Secretary or that it violated his procedural due process rights. Accordingly, the Court will grant in part and deny in part Doe's motion for summary judgment, grant in part and deny in part the Secretary's cross-motion, vacate the SRA's decision, and remand this matter to the Secretary for further proceedings consistent with this decision.

## BACKGROUND

### I.    <u>Statutory and Regulatory Framework.</u>

Upon being discharged from the Navy, a servicemember is issued a "Certificate of Release or Discharge from Active Duty" that describes their "Character of Service." An administrative discharge—the type at issue in this case—can be characterized in one of three ways: Honorable, Under Honorable Conditions, or Under Other Than Honorable Conditions. 32 C.F.R. § 724.109(a). A former servicemember's discharge characterization affects, among other things, eligibility for

healthcare, disability, and retirement benefits. *See, e.g.*, 38 C.F.R. § 3.12. Given the import of this characterization, Congress directed each branch of the armed forces to "establish a board of review . . . to review the discharge or dismissal . . . of any former member of an armed force under the jurisdiction of [its] department." 10 U.S.C. § 1553(a). "The objective of a discharge review is to examine the propriety and equity of the applicant's discharge and to effect changes, if necessary." 32 C.F.R. § 70.9(a); *see* 10 U.S.C. § 1553(b)(1) (providing that a discharge review board "may, subject to review by the Secretary concerned, change a discharge or dismissal, or issue a new discharge, to reflect its findings"). The Naval Discharge Review Board performs this role for the Navy.[3]

To request a discharge upgrade, a former servicemember must submit an application that includes a completed DD Form 293. *See* 32 C.F.R. § 724.802. That form provides an applicant with the opportunity to request a specific change to the character of, or reason for, their discharge, and to ask that the Board consider any specific issues that, in the applicant's view, support the requested change. *Id.* §§ 724.802(a)-(b). Applicants may also submit written briefs and evidentiary materials as part of their application. *See id.* §§ 724.801, 724.802(b)(1)(iv).

The Board decides applications for discharge upgrades on a "case-by-case basis" following "careful, objective consideration." *Id.* §§ 724.804(a), (c). After reviewing an application, the Board must issue a "decisional document" that, among other things, provides its conclusions regarding "[w]hether the character of or reason for discharge should be changed" and "[t]he specific changes to be made, if any." *Id.* §§ 724.803(h)(1)-(2). The decision must include "[a] list of the items

---

[3] The NDRB is similar to, but distinct from, the Board for Correction of Naval Records ("BCNR"). Whereas the NDRB is tasked with reviewing the discharge and dismissal of former service members, and taking corrective action where needed, the BCNR is more broadly tasked with "correct[ing] any military record" when "necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1).

submitted as issues on DD Form 293," as well as the Board's response to those issues. *Id.* §§ 724.803(e)-(f). The Board must also "discuss the issues that provide a basis for the decision." *Id.* § 724.806(a). In addition, the Board has certain explanatory obligations when it denies the full change requested by the applicant based on an issue of propriety or equity. *See id.* §§ 724.806(b)-(c) (issues of propriety); *id.* §§ 724.806(e)-(f) (issues of equity). For example, if the Board disagrees with an applicant's position on an issue of equity because it "concludes that aggravating factors outweigh mitigating factors," it must "set forth reasons" for reaching that conclusion and address the applicability or weight of any factor "expressly raised as an issue by the applicant." *Id.* § 724.806(f)(2)(iv).

Before the NDRB issues a final decision, the Secretary of the Navy or his designee— referred to as the Secretarial Review Authority or "SRA"—may review the decisional document for "[a]ny specific case in which the SRA has an interest" or "[a]ny specific case that the president of the NDRB believes is of significant interest to the SRA" to determine whether corrections are necessary. *Id.* §§ 724.814(a)(1)(i)-(ii). If the SRA determines that corrections are required, he must return the decisional document to the Board for corrective action, along with an addendum explaining his reasoning. *See id.* §§ 724.814(c)-(d). If the SRA rejects the Board's decision in whole or in part, he must list the issues on which his decision is based and provide his reasons for rejecting the Board's conclusions concerning any decisional issues that it resolved in the applicant's favor. *See id.* § 724.814(d)(2)(iv)(A). The SRA's explanation must comport with the same equitable principles that guide the Board's decision-making process. *See id.* (citing 32 C.F.R. § 724.806(f)). The Board must implement any changes specified by the SRA. *Id.* §§ 724.814(c)-(d)(1).

The Department of Defense has issued a series of policy memoranda—the Hagel Memorandum (2014),[4] the Kurta Memorandum (2017),[5] and the Wilkie Memorandum (2018)[6]—that instruct military correction boards on how to review claims involving, as relevant here, service-related military sexual trauma and posttraumatic stress disorder.[7] Pursuant to the Hagel and Kurta Memoranda, discharge review boards must give "liberal consideration . . . to veterans petitioning for discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions including PTSD . . . [or] sexual assault." Kurta Memorandum ¶ 3; see Hagel Memorandum, at 3. If the applicant's PTSD or MST "may reasonably have existed at the time of discharge," a discharge review board must "liberally conside[r]" that condition or experience "as excusing or mitigating the discharge." Kurta Memorandum ¶ 16; see also 10 U.S.C. § 1553(d)(3) (requiring same).[8] "Liberal consideration" does not, however, "mandate an upgrade," and "[i]n some cases, the severity of misconduct may outweigh any

---

[4] Memorandum from Charles T. Hagel to Secretaries of the Military Departments, *Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder* (Sept. 3, 2014).

[5] Memorandum from Anthony M. Kurta to Secretaries of the Military Departments, *Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment* (Aug. 25, 2017).

[6] Memorandum from Robert L. Wilkie to Secretaries of the Military Departments, *Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Regarding Equity, Injustice, or Clemency Determinations* (July 25, 2018).

[7] For ease of reference, the Hagel, Kurta, and Wilkie Memoranda are attached as Exhibits A, B, and C to this memorandum and order.

[8] In 2016, Congress amended 10 U.S.C. § 1553 to incorporate the Hagel Memorandum's requirement that discharge review boards give "liberal consideration" to discharge upgrade applications submitted by veterans with service-related PTSD or related conditions. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 535, 130 Stat. 2000, 2123-24 (2016).

mitigation." Kurta Memorandum ¶¶ 18, 26(k); *see also* Wilkie Memorandum ¶ 6(k) ("Relief is generally more appropriate for nonviolent offenses than for violent offenses."). The Kurta Memorandum notes that "[r]equests for discharge relief typically involve four questions" (the "Kurta Questions"):

1.  Did the veteran have a condition or experience that may excuse or mitigate the discharge?
2.  Did that condition exist [or that] experience occur during military service?
3.  Does that condition or experience actually excuse or mitigate the discharge?
4.  Does that condition or experience outweigh the discharge?

Kurta Memorandum ¶ 2 (list formatting altered).

## II.    Factual Background.

The following facts, which are drawn from the administrative record ("AR"),[9] are undisputed.

Plaintiff John Doe enlisted in the Navy in 2009, when he was 20 years old. AR, at 281-84. He was stationed at the North Island Naval Air Station in San Diego, California, where he served as an Avionics Technician in a helicopter squadron. *See id.* at 119, 132-33. Doe excelled during his first year in the Navy. He was described as a "productive sailor with limitless potential" in his first performance evaluation, *id.* at 133; as an "invaluable asset" who displayed "[s]uperb military appearance and professionalism" in his second evaluation, *id.* at 136; and as a "model Sailor in every aspect" who "[e]xemplified Navy Core Values" in his third evaluation, *id.* at 139.

In July 2011, one month after receiving his third performance evaluation, Doe was raped by a fellow sailor. *See id.* at 151-53. Doe had gone out drinking with his friends that evening, but he lost track of them after becoming drunk. *Id.* at 151. He began hanging out with a group of people, which included other sailors, whom he encountered at a bar. *See id.* One of the sailors

---

[9] The administrative record is docketed at ECF 19 through ECF 19-6.

invited Doe to join them at a house party afterwards, where the group continued drinking and socializing. *Id.* The party died down after a fight broke out, and Doe fell asleep in an empty bedroom. *See id.* at 152. When Doe awoke, he had been undressed and realized that the sailor who had invited him to the party was raping him. *Id.* at 152, 177. Soon after waking, Doe rolled away from his assailant, who got up and entered the bathroom. *Id.* Doe quickly got dressed and went home. *Id.*

Doe felt embarrassed and ashamed following the assault, and he kept it secret for several months. *See id.* at 152, 177-79. He isolated himself, grew increasingly depressed, and self-medicated with alcohol. *Id.* at 152, 177-78. In September 2011, Doe was found drunk on duty, and he was sanctioned with two non-judicial punishments ("NJPs"). *Id.* at 12, 352-53.[10] Roughly one month later, on October 29, 2011, Doe got into an altercation with two other servicemembers during a party that he was hosting at his apartment. *See id.* at 158, 178. Multiple guests informed Doe that a sailor had sexually harassed one or more women while at the party. *See id.* at 178. After learning this information, Doe approached the sailor and asked him to leave. *See id.* In response, the sailor punched Doe in the face. *Id.* While the exact sequence of events that followed is not clear, the relevant facts are undisputed. Doe fought back after being punched by the sailor, but a Marine joined the fight and choked Doe from behind. *Id.* As Doe puts it, this "triggered some serious PTSD," and led him to take the fight "to the extremes." *Id.* At some point during the fight, Doe punched the sailor accused of sexual harassment in the head and face, and then attempted to kick or stomp on his head while he was laying on the ground. *See id.* at 158, 178. A fourth person

---

[10] The first NJP effectively placed Doe on a term of probation because it provided that his punishment would be suspended for six months. *See* AR, at 12, 352. The suspension was subsequently vacated "due to continued misconduct," and Doe received a second NJP, which included a punishment that took immediate effect, for the same September 2011 incident when he was found drunk on duty. *Id.* at 12, 353.

joined the altercation and put the Marine in a chokehold, at which point Doe punched the Marine in the head and face. *See id.* at 158, 178. The record does not indicate how the fight ended or whether any of the participants in it sustained injuries requiring medical attention. Several days later, the Navy searched Doe's room, where it found "Spice," a prohibited synthetic cannabinoid, and a smoking pipe. *See id.* at 157.

Doe's mental health and job performance continued to deteriorate over the following months, and he received his first negative performance evaluation. *Id.* at 141-42, 178. In late November 2011, Doe enrolled in the Navy's residential alcohol abuse treatment program and quit drinking alcohol. *Id.* at 178-79, 561. After graduating to the outpatient phase of the program, Doe began to regularly attend Alcoholics Anonymous meetings. *See id.* at 162-63, 187. But while Doe succeeded in maintaining his sobriety, his mental health kept worsening. In March 2012, Doe was hospitalized due to suicidal ideation and severe depressive symptoms. *See id.* at 162-67, 179. During that hospitalization, he disclosed for the first time, to his treating psychiatrist, that he had been raped the previous summer. *Id.* at 162, 179. The same psychiatrist subsequently diagnosed Doe with depression and anxiety stemming from his sexual assault, and flagged the possibility that Doe might have PTSD. *See id.* at 570-71.[11] Around this time, Doe began to meet with one of the Navy's Sexual Assault Prevention Response Advocates. *See id.* at 197.

In April 2012, the Navy initiated special court-martial proceedings, charging Doe with violating two articles of the Uniform Code of Military Justice ("UCMJ") based on Doe's conduct during the October 2011 fight and his possession of Spice and a smoking pipe. *See id.* at 157-58. After conferring with counsel, Doe admitted that he was guilty of the charges and requested a

---

[11] A Veterans Affairs clinician formally diagnosed Doe with PTSD in 2013, and he was designated as 100% service-connected for his PTSD in 2018. *See* AR, at 250-52.

separation in lieu of trial by court-martial. *Id.* at 173-74. The Navy allowed Doe's request and, in June 2012, he was discharged under Other Than Honorable Conditions. *Id.* at 222, 224.

## III.    **Procedural History.**

In September 2020, Doe submitted his first discharge upgrade application to the NDRB. *See id.* at 70-71. On his DD Form 293, Doe argued that a discharge upgrade was warranted for four reasons:

1. Because the fights and substance abuse that led to [Doe's] discharge were the results of his undiagnosed and untreated PTSD caused by [MST], his [Other Than Honorable] discharge status is improper and inequitable under the Hagel and Kurta Memoranda.
2. [Doe's] Discharge Proceeding was improper and inequitable because the Navy did not properly apply the [applicable separation standards].
3. It was improper and an injustice to characterize [Doe's] naval service as [Other Than Honorable], because he was not granted "due consideration" for his mental condition and its sexual trauma cause.
4. The Wilkie Memorandum directs that [Doe's] discharge should be upgraded.

*Id.* at 74 (citations omitted). Doe expounded on each of these arguments in a memorandum supporting his application. *See id.* at 76-102. He attached 25 exhibits to the memorandum, including a personal statement, *id.* at 274-76, and a psychological evaluation prepared by Dr. Sandra A. Dixon, a clinical psychologist, *id.* at 254-70. Dr. Dixon determined that Doe was experiencing, at the time of his discharge, severe PTSD and Major Depressive Disorder, and that his PTSD was caused by the July 2011 sexual assault. *See id.* at 266. She also concluded that "there is a clear nexus between [Doe's] mental health disorders and the conduct leading to discharge." *Id.* at 267.

The NDRB issued its decision on May 31, 2021. *See id.* at 62-69. It concluded that Doe's misconduct was partially, but not fully, mitigated by his MST and mental health conditions. *See id.* at 66-67. Accordingly, it determined that his original discharge was "proper but not equitable," and it upgraded his discharge characterization to General (Under Honorable Conditions). *Id.* at 67.

In September 2021, the Secretary of the Navy entered into an agreement to resolve a class-action lawsuit filed in the District of Connecticut. ECF 211-2, *Manker v. Del Toro*, No. 18-cv-00372-CSH (D. Conn. Sept. 16, 2021). The plaintiffs alleged that the NDRB "systematically denied discharge upgrades" to "veterans with service-connected PTSD, [traumatic brain injury], and other related mental health conditions" who had received less-than-honorable administrative discharges. *Id.* § I.A. Although the Secretary denied the allegations, he found it "desirable and beneficial" to settle the case. *Id.* § I.K. The settlement provided that the NDRB would automatically reconsider certain cases where "the applicant did not receive a full upgrade to Honorable." *Id.* § IV.A.1. The Secretary also agreed to establish a procedure to ensure that the Kurta Questions are applied by the NDRB and SRA in a consistent and standardized manner. *See id.* §§ IV.D.1, K. The settlement received judicial approval on February 15, 2022. ECF 219, *Manker v. Del Toro*, No. 18-cv-00372-CSH (D. Conn. Feb. 15, 2022).

The NDRB automatically reconsidered Doe's application pursuant to the *Manker* settlement and, in October 2022, reached a new decision. AR, at 27-32, 57-59. The Board "found there was evidence of a significant military sexual trauma" that "exacerbated" Doe's pre-existing problems with drinking and becoming aggressive while intoxicated. *Id.* at 31. It also answered each of the four Kurta Questions in the affirmative, finding that Doe's PTSD "was a mitigating factor associated with the in-service misconduct," and ultimately concluding that Doe's MST and PTSD "outweighed [his] assigned Discharge Characterization." *Id.* at 30-31. Accordingly, the three-member Board unanimously voted to award Doe an Honorable discharge. *Id.* at 31-32. It also changed Doe's "Narrative Reason for Separation" from "Separation in Lieu of Court-Martial" to "Secretarial Authority," and it revised his reentry code to permit reenlistment without a waiver. *See id.*

The Director of the Navy Council of Review Boards, whom the Secretary of the Navy had designated as the SRA for the NDRB, intervened before the Board's decision became final. *Id.* at 24. The SRA informed Doe that he possessed the authority to accept or modify the Board's decision, and he apprised Doe of his right to submit additional documents or comments for consideration. *Id.* In a letter submitted by counsel, Doe asked the SRA to affirm the Board's decision on the grounds previously argued, incorporating by reference his original application and the supplement he submitted when the Board reconsidered his application pursuant to the *Manker* settlement. *See id.* at 8-11.

The SRA issued his decision on February 28, 2023. *Id.* at 1. He agreed with the Board's affirmative answers to the first three Kurta Questions, but he disagreed with its affirmative response to Kurta Question Four. *See id.* at 1-2. In other words, the SRA concluded that Doe's misconduct was mitigated, but not outweighed, by his service-related MST and PTSD. *See id.*; Kurta Memorandum ¶ 2(d) (Kurta Question Four asking whether the veteran's "condition or experience outweigh[s] the discharge"). The SRA consequently reversed the Board's decision to award Doe an Honorable discharge, reasoning that only a "General (under honorable conditions) discharge is warranted." AR, at 2. He agreed, however, with the Board's decision to change Doe's "Narrative Reason for Separation" and reentry code. *Id.*

When considering the misconduct underlying Doe's discharge, the SRA noted that Doe had received two NJPs for being drunk on duty and that he had been charged with two UCMJ violations: one for possessing Spice and drug paraphernalia, the other for assaulting two sailors[12] during the October 2011 fight. *See id.* The SRA weighed the latter of these charges most heavily

---

[12] Some documents in the record refer to the individuals whom Doe fought as a sailor and a Marine, but the SRA refers to them both as "sailors."

in his decision to reverse the Board. After reciting the applicable legal standards and summarizing Doe's misconduct, he wrote: "While [the Kurta Memorandum] provides that an Honorable discharge does not require flawless military service, I find that the Applicant's misconduct, especially assaulting fellow Sailors, to be egregious such that it outweighs any mitigation from MST and mental health conditions." *Id.* The SRA also declined to grant relief on account of Doe's post-discharge academic achievements, noting that the Wilkie Memorandum "provides that relief is generally more appropriate for nonviolent offenses than for violent offenses." *Id.* "Therefore," he continued, "because your discharge involved violence against your shipmates I find that relief, beyond what has been granted here, and in previous NDRB decisions, is not warranted." *Id.*

In December 2023, Doe filed a two-count complaint in this Court seeking judicial review of the SRA's decision. ECF 1. Count 1 seeks declaratory judgment that the Secretary violated the Administrative Procedure Act ("APA"). *Id.* ¶¶ 128-31. Count 2 asserts a violation of the APA, 5 U.S.C. § 706. ECF 1, ¶¶ 132-59. The complaint advances four related theories as to how the alleged APA violation occurred. Generally speaking, Doe argues that the SRA's decision was arbitrary and capricious because it failed to respond to the issues that he raised and failed to adequately explain its conclusion that his MST and PTSD do not outweigh his misconduct, in violation of: (1) Naval regulations, 32 C.F.R. §§ 724.806 and 724.814; (2) the Hagel, Kurta, and Wilkie Memoranda; and (3) the *Manker* settlement. ECF 1, ¶¶ 132-54. Doe further argues that by violating these regulations and procedures, the SRA also violated (4) Doe's rights under the Due Process Clause of the Fifth Amendment. *Id.* ¶¶ 155-59. The parties filed cross-motions for summary judgment. ECF 25, 29. Once the motions were briefed, the Court held a hearing and took the matter under advisement. ECF 49.

## STANDARD OF REVIEW

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Boston Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). The district court's role is "not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id.*; *see* 5 U.S.C. § 706(2)(A).[13] "An agency action is arbitrary and capricious when the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Boston Redevelopment Auth.*, 838 F.3d at 47 (quoting *Assoc'd Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). NDRB decisions are informal adjudications, *see McKinney v. Wormuth*, 5 F.4th 42, 46 (D.C. Cir. 2021), and they are subject to arbitrary and capricious review under the APA, *see Mahoney v. Del Toro*, 99 F.4th 25, 34 (1st Cir. 2024).

Judicial review of decisions issued by military correction boards is "'unusually deferential.'" *McKinney*, 5 F.4th at 45 (quoting *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)); *see Mahoney*, 99 F.4th at 34 (same). "Accordingly, a reviewing court must uphold an agency's decision that is free from legal errors . . . and is supported by any rational review of the record." *Mahoney*, 99 F.4th at 34 (citations and quotation marks omitted). A reviewing court "may not substitute its judgment for that of the [Board], even if it disagrees with

---

[13] Count 1 of the complaint, which seeks a declaratory judgment that the SRA violated the APA, is subject to the same standard of review as Count 2 of the complaint, which asserts a violation of the APA. *See Boston Redevelopment Auth.*, 838 F.3d at 48 ("Given the way in which the [plaintiff] postured the case, the district court's application of the APA standard to its claim for declaratory relief cannot be faulted."); *see also Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 26 (1st Cir. 1998) (applying arbitrary and capricious standard to APA claims brought under the Declaratory Judgment Act).

the [Board's] conclusions." *Id.* (bracketed text altered) (quoting *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015)). An agency nevertheless "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). In particular, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). A court "may not supply a reasoned basis for the agency's action that the agency itself has not given," but it should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (citations and quotation marks omitted).

## DISCUSSION

A narrow dispute lies at the heart of this case. The SRA agreed with the Board's affirmative responses to the first three Kurta Questions—that is, he agreed that Doe has service-related MST and PTSD and that these conditions mitigate his misconduct. *See* AR, at 1-2; Kurta Memorandum ¶¶ 2(a)-(c). But the SRA disagreed with the Board's affirmative response to Kurta Question Four, which asks whether an applicant's mitigating "condition or experience outweigh[s] the [applicant's] discharge." Kurta Memorandum ¶ 2(d). Whereas the Board found that Doe's MST and PTSD outweigh his misconduct, AR, at 30-31, the SRA concluded that Doe's misconduct, "especially assaulting fellow Sailors," was "egregious such that it outweighs any mitigation from MST and mental health conditions," *id.* at 2. Based on this conclusion, the SRA determined that Doe is entitled only to a General (Under Honorable Conditions) discharge rather than an Honorable discharge. *Id.* Accordingly, the central issue before the Court is whether the SRA adequately explained, in the manner required by the Navy's regulations, the APA, and other applicable

authorities, his reasons for concluding that Doe's misconduct outweighs any mitigation from his MST and PTSD.

For the reasons explained below, the Court concludes that the SRA violated the regulations governing the exercise of Secretarial Review Authority because he failed to adequately explain, in light of Doe's arguments regarding the mitigating circumstances of the October 2011 fight, why he concluded that aggravating factors outweigh mitigating factors in Doe's case, as required by 32 C.F.R. §§ 724.814(d)(2)(iv)(A) and 724.806(f)(2)(iv). For similar reasons, the Court also holds that the SRA failed to adequately explain how he conducted the Kurta Question Four balancing test, or demonstrate that he assessed Doe's case on its own merits, as required by the Wilkie Memorandum. Finally, the Court concludes that Doe cannot challenge the SRA's alleged violation of the *Manker* settlement in this Court, and that the SRA did not violate Doe's procedural due process rights.

## I.    Compliance with Naval Regulations.

"An agency has the duty to follow its own federal regulations, even when those regulations provide greater protection than is constitutionally required." *Nelson v. I.N.S.*, 232 F.3d 258, 262 (1st Cir. 2000). Accordingly, "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" *Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Environmentel, LLC v. F.C.C.*, 661 F.3d 80, 85 (D.C. Cir. 2011)); *see Town of Weymouth, Massachusetts v. Massachusetts Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir.) (quoting same), *on reh'g*, 973 F.3d 143 (1st Cir. 2020).

Doe contends that the SRA violated five provisions of the regulations governing the exercise of Secretarial Review Authority—namely, 32 C.F.R. §§ 724.814(d)(2)(iv)(A) and (B), and 724.806(f)(2)(i), (ii), and (iv)—by failing to acknowledge or respond to Doe's mitigation

arguments concerning the circumstances of the October 2011 fight, and thus failing to adequately explain his reasons for rejecting the Board's affirmative response to Kurta Question Four. *See* ECF 26, at 14-15; ECF 35, at 15-16. In Doe's view, the SRA's principal legal error was his failure to comply with Section 724.806(f)(2)(iv), which required the SRA to set forth his reasons for concluding that aggravating factors outweigh mitigating factors and to explain the applicability or weight of any factor expressly raised by Doe. The Court agrees that the SRA failed to comply with Section 724.806(f)(2)(iv), and it therefore does not reach Doe's related arguments regarding Sections 724.814(d)(2)(iv)(B) and 724.806(f)(2)(i)-(ii).

Section 724.814(d)(2)(iv)(A) requires the SRA to provide his "reasons for rejecting the conclusion of the NDRB" concerning any "decisional issues which, if resolved in the applicant's favor, would have resulted in a change to the discharge more favorable to the applicant than that afforded by the SRA's decision." 32 C.F.R. § 724.814(d)(2)(iv)(A). This provision also requires the SRA to explain his reasons for rejecting the Board's conclusion "under the [equitable] principles in § 724.806(f)." *Id.* Section 724.806(f)(2)(iv), in turn, provides that "[w]hen the [SRA] concludes that aggravating factors outweigh mitigating factors, the [SRA] must set forth reasons such as the seriousness of the offense, specific circumstances surrounding the offense, number of offenses, lack of mitigating circumstances, or similar factors." *Id.* § 724.806(f)(2)(iv). The regulation then provides that the SRA "is not required . . . to explain why [he] relied on any such factors *unless* the applicability or weight of such a factor is expressly raised as an issue by the applicant." *Id.* (emphasis added). Under this latter provision, when the weight or applicability of an aggravating or mitigating factor *is* expressly raised as an issue by the applicant, the SRA is "required" to explain why he did or did not rely on that factor in his analysis. *Id.*

The Secretary contends that the SRA complied with Section 724.806(f)(2)(iv) because he set forth three reasons for concluding that aggravating factors outweigh mitigating factors in Doe's case: (1) the "number of offenses" (i.e., that Doe was charged with two NJPs and two UCMJ violations); (2) the "seriousness of the offenses" (i.e., that Doe's misconduct was the subject of a Special Court-Martial); and (3) the "specific circumstances" of the October 2011 fight (i.e., that Doe assaulted fellow sailors and his conduct was "egregious"). ECF 39, at 11. The SRA was not, however, required only to "set forth" reasons for his conclusion; he was also required to "explain why" he did or did not rely on any factor that Doe "expressly raised." 32 C.F.R. § 724.806(f)(2)(iv). In his discharge upgrade application, Doe expressly raised whether the violence he committed against his fellow sailors was triggered by his PTSD and MST. In the memorandum supporting his application, he argued that his participation in the October 2011 fight should be viewed as a "trauma respons[e]." AR, at 94. He explained that the fight was precipitated by two events: (1) Doe learned that a sailor had sexually harassed one of his friends while at the party; and (2) the sailor punched Doe in the face when Doe asked him to leave. *See id.* Doe further argued that his "instinctive reaction to fight back was exacerbated" by his untreated PTSD and his own experience of MST. *See id.* at 93-94. And he presented a psychological evaluation from Dr. Dixon finding "a clear nexus between [his] mental health disorders and the conduct leading to discharge." *Id.* at 267. Once these mitigating factors were "expressly raised," the SRA was required to "explain why" he declined to rely on them in assessing the applicability of the principal aggravating factor, involving Doe's violence against fellow sailors in the fight, or why they did not outweigh the aggravating factors. 32 C.F.R. § 724.806(f)(2)(iv).

The SRA failed to offer such an explanation, stating only that he found Doe's violence against "fellow Sailors" to be "egregious." AR, at 2. The SRA did not explain why, in his view,

the severity of Doe's violent conduct outweighed the evidence that Doe's involvement in the fight was a trauma response stemming from his PTSD and his own sexual assault at the hands of a fellow sailor. By failing to acknowledge or respond to Doe's arguments concerning the mitigating circumstances of the fight, the SRA failed to adequately "explain why" he relied on Doe's violent conduct toward fellow sailors as the principal aggravating factor driving his decision to reject the Board's affirmative response to Kurta Question Four. *See* 32 C.F.R. §§ 724.806(f)(2)(iv), 724.814(d)(2)(iv)(A).

Of course, the SRA had the discretion to reject Doe's arguments if he found them unpersuasive. *See Mahoney*, 99 F.4th at 34 (noting the heightened deference owed to military board judgments); *Kreis*, 866 F.2d at 1511 ("Adjudication of these claims requires the district court to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct."). But the SRA was nevertheless required to explain why he exercised his discretion to reject those arguments. *See* 32 C.F.R. § 724.806(f)(2)(iv); *State Farm*, 463 U.S. at 48 (an agency "must cogently explain why it has exercised its discretion in a given manner"); *cf. Rutledge v. Del Toro*, 23-cv-1583-CRC, 2024 WL 3225958, at *7 (D.D.C. June 28, 2024) ("Although BCNR decisions rightly receive substantial deference, the Court cannot defer into a void."). Because the SRA failed to provide the explanation required by Section 724.806(f)(2)(iv), his decision was arbitrary and capricious, in violation of the APA.

## II.    **The Kurta and Wilkie Memoranda.**

Doe next argues that the SRA failed to sufficiently explain his reasons for rejecting the Board's affirmative response to Kurta Question Four, because he "only offered a bald conclusion without articulating how he weighed the evidence of Mr. Doe's MST and PTSD against the cited misconduct." ECF 35, at 5. Doe further contends, for similar reasons, that the SRA "failed to fulfill

his obligations under the Kurta and Wilkie Memoranda to give Mr. Doe's case 'liberal consideration' and to evaluate his case 'on its own merits.'" *Id.* at 12 (quoting Kurta Memorandum ¶ 3; Wilkie Memorandum ¶ 5). Because the SRA's decision lacks any indication that he considered the relevant evidence and arguments that Doe submitted concerning Kurta Question Four, the Court agrees that he did not reasonably explain his conclusion for Kurta Question Four or evaluate Doe's case on its own merits.

It is undisputed that the SRA was required to comply with the Hagel, Kurta, and Wilkie Memoranda. *See* ECF 26, at 17-18; ECF 30, at 17-19; *see also Doyon v. United States*, 58 F.4th 1235, 1239 (Fed. Cir. 2023) ("There is no dispute that the Hagel and Kurta Memos' guidance is binding on the BCNR."). Indeed, the SRA referred to the Kurta Questions as "the required assessment" that established the framework for his decision. AR, at 1-2; *see Gen. Elec. Co. v. E.P.A.*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." (citations omitted)). Pursuant to the "liberal consideration" standard first announced in the Hagel Memorandum, the SRA was required to "review [Doe's] case with liberal consideration to [Doe] that [PTSD] . . . potentially contributed to the circumstances resulting in [his] discharge." 10 U.S.C. § 1553(d)(3)(A)(ii); *see* Kurta Memorandum ¶ 3. The SRA was also required to assess Doe's case "on its own merits." Wilkie Memorandum ¶ 5. Complementing these overarching principles, the Kurta Memorandum provides the following guidance for Kurta Question Four:

> 18.    In some cases, the severity of misconduct may outweigh any mitigation from mental health conditions, including PTSD; . . . sexual assault; or sexual harassment.
>
> 19.    Premeditated misconduct is not generally excused by mental health conditions . . . . However, substance-seeking behavior and efforts to self-medicate

symptoms of a mental health condition may warrant consideration. Review Boards will exercise caution in assessing the causal relationship between asserted conditions or experiences and premeditated misconduct.

Kurta Memorandum ¶¶ 18-19.

While the SRA recited relevant guidance from the Kurta and Wilkie Memoranda in his decision, he did not acknowledge, much less respond to, Doe's evidence and arguments concerning Kurta Question Four. *See* AR, at 1-2. For example, the SRA quoted the Kurta Memorandum's guidance that relief may be appropriate for "'some significant misconduct sufficiently justified or outweighed by the facts and circumstances.'" *Id.* at 2 (quoting Kurta Memorandum ¶ 26(k)). Yet, as discussed, the decision contains no express indication that the SRA considered Doe's argument that the "facts and circumstances" of the October 2011 fight mitigate the severity of his misconduct in this case. *See id.* at 94. The SRA similarly noted that "'[p]remeditated misconduct is not generally excused by mental health conditions,'" *id.* at 2 (quoting Kurta Memorandum ¶ 19), yet the decision likewise does not evince any consideration of Doe's argument that "[t]here is no indication that [Doe's] actions leading to his discharge were premeditated," *id.* at 94. Instead, the SRA categorically rejected, in a single sentence, the possibility that Doe's MST and PTSD could outweigh the severity of his misconduct, writing: "While [the Kurta Memorandum] provides that an Honorable discharge does not require flawless military service, I find that [Doe's] misconduct, especially assaulting fellow Sailors, to be egregious such that it outweighs any mitigation from MST and mental health conditions." *Id.* at 2. The SRA was "not required to dissect in minute detail every contention that [Doe] advance[d]," but he was required to articulate his "decision in terms adequate to allow a reviewing court to conclude that [he] thought about the evidence and the issues and reached a reasoned conclusion." *Raza v. Gonzales*, 484 F.3d 125, 128 (1st Cir. 2007). The paucity of the SRA's reasoning precludes this Court from drawing such conclusions.

20

The text of the SRA's decision supports an inference that he did not consider Doe's evidence and arguments regarding Kurta Question Four. At the beginning of his decision, the SRA lists eleven "references" that he considered. *See* AR, at 1. These references include the Board's 2021 decision, the Kurta and Wilkie Memoranda, the Navy's "Discharge Review Board Manual," and two letters that Doe submitted upon learning that the SRA was reviewing the Board's decision. *See id.* In the first letter, which is four pages long, Doe's counsel stated that he was "not re-submitting memoranda and evidence previously filed and already before the NDRB," and instead "incorporate[d] by reference all of those submissions" in asking the SRA to affirm the Board's 2022 decision. *Id.* at 9. In the second letter, which is two pages long, Doe asked the SRA to affirm the Board's decision and described the "profound impact" it had on his life. *Id.* at 20. In addition to listing the letters as "references," the SRA wrote that he "considered [both letters] prior to making [his] decision." *Id.* at 2. Indeed, his decision reflects such consideration. In the penultimate paragraph, the SRA noted that he considered whether to grant relief "in light of [Doe's] recent academic achievements," *id.*, which Doe had discussed in the letter he submitted, *see id.* at 20 (Doe noting that he is pursuing a four-year college degree for computer programming). In contrast, the decision contains no indication that the SRA reviewed any of Doe's submissions concerning the merits of his request for a discharge upgrade—that is, the memorandum supporting his original application, *id.* at 76-102, the exhibits attached to that memorandum, *id.* at 104-363, or the supplement that he submitted upon learning that his application would be reconsidered pursuant to the *Manker* settlement, *id.* at 35-56. Given that the SRA listed as "references" and expressly discussed the two letters submitted by Doe, his failure to list as "references" or otherwise acknowledge Doe's merits submissions gives rise to the inference that he did not, in fact, consider those submissions. The Court is therefore unable to conclude that the SRA complied with his

obligation to consider Doe's case "on its own merits." Wilkie Memorandum ¶ 5; *cf. Villareal-Dancy v. U.S. Dep't of the Air Force*, 633 F. Supp. 3d 19, 34 (D.D.C. 2022) (holding that the Air Force SRA's decision to deny relief was arbitrary and capricious because the "decision, at a minimum, suggest[ed] a lack of familiarity with (or lack of consideration of) the significant evidence Plaintiff proffered regarding her post-discharge accomplishments").

The Secretary defends the SRA's decision on two grounds, but neither is persuasive. He first points to the SRA's discussion of the negative aspects of Doe's service record as evidence that his decision is adequately reasoned. *See* ECF 30, at 11-14; ECF 39, at 2-5. Indeed, the SRA noted that Doe received two NJPs, and that he was charged with violating two articles of the UCMJ for assaulting other sailors and possessing Spice and drug paraphernalia. *See* AR, at 2. The specific incidents of Doe's misconduct are, of course, relevant to Kurta Question Four. But Kurta Question Four does not call for a mere recitation of an applicant's misconduct; it calls for a balancing of an applicant's misconduct against the applicant's mitigating experiences or conditions. *See* Kurta Memorandum ¶ 2(d). For the reasons already discussed, the SRA's decision provides no indication that he considered Doe's mitigation evidence and arguments, much less balanced them against Doe's misconduct.

The Secretary next contends that the SRA's resolution of certain issues in Doe's favor demonstrates that the SRA "necessarily *considered* Mr. Doe's explanation for his violent actions because the SRA *accepted* Mr. Doe's explanation for his violent actions." ECF 39, at 7 (emphasis in original). Specifically, the Secretary argues that if the SRA had ignored Doe's explanation of the circumstances surrounding the October 2011 fight, there would have been no basis for him to agree with the Board's conclusion, with respect to Kurta Question Three, that Doe's MST and PTSD mitigate his discharge. *See id.* at 6-7; AR, at 1-2; Kurta Memorandum ¶ 2(c). The text of

the SRA's decision does not, however, support such an inference. The SRA stated that he "agree[d] with the Board . . . that the first three of four" Kurta Questions "are answered in the affirmative." AR, at 1-2. He then recited the first three Kurta Questions. *Id.* at 2. After reciting Kurta Question Three, which asks, "[d]oes that condition or experience actually excuse or mitigate the discharge?" the SRA wrote, "[y]es." *Id.* He did not explain how or why he reached this conclusion. *Id.* The SRA's one-word agreement with the Board's answers to the first three Kurta Questions does not demonstrate that he "necessarily considered" Doe's explanation for the fight. *See* ECF 39, at 7 (emphasis omitted); *cf. Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) ("When an agency merely parrots the language of a statute without providing an account of how it reached its results, it has not adequately explained the basis for its decision.").

To be sure, it is possible that the SRA concluded that Doe was entitled to partial relief—that is, a General (Under Honorable Conditions) discharge—because he "considered" and "accepted" Doe's arguments regarding the circumstances of the October 2011 fight. *See* ECF 39, at 7 (emphasis omitted). But it is also possible that the SRA reached this conclusion for any number of other reasons. The SRA may have concluded that Doe's MST and PTSD mitigated the two NJPs he received for being drunk on duty, given the Kurta Memorandum's guidance that "substance-seeking behavior and efforts to self-medicate symptoms of a mental health condition may warrant consideration." Kurta Memorandum ¶ 19; AR, at 2 (quoting same). So too is it possible that the SRA reached this conclusion because of the Kurta Memorandum's guidance that mental health conditions "inherently affect one's behaviors and choices causing veterans to think and behave differently than might otherwise be expected." Kurta Memorandum ¶ 26(e); *see* AR, at 2 (quoting same). Or the SRA may have concluded that partial relief was warranted under the Kurta Memorandum's "liberal consideration" policy, given that Doe's MST and PTSD were not

considered at the time of his original discharge. *See* Kurta Memorandum ¶ 3; AR, at 1. Whatever the SRA's reasons for agreeing that Doe was entitled to a General (Under Honorable Conditions) discharge, he did not include them in his decision, nor did he offer sufficient detail to permit the "path" of his reasoning to "reasonably be discerned." *State Farm*, 463 U.S. at 43 (citation and quotation marks omitted).

Accordingly, the Court concludes that the SRA's decision was arbitrary and capricious because he failed to provide a reasoned explanation for rejecting the Board's affirmative response to Kurta Question Four or demonstrate that he considered Doe's case on its own merits.

### III.   The *Manker* Settlement.

Doe next argues that the SRA's decision was arbitrary and capricious because it violated the terms of the *Manker* settlement. The Court is not persuaded. Doe has not cited any authority to support his claim that an agency's alleged violation of a settlement agreement also amounts to a violation of the APA, nor has the Court located any such authority through its own research. While Doe correctly notes that agency action may be arbitrary and capricious where the agency fails to follow its own regulations and procedures, *see Town of Weymouth*, 961 F.3d at 47, the terms of the *Manker* settlement do not constitute the Navy's "regulations and procedures." Those terms instead constitute a contract entered between the Secretary and the *Manker* settlement class. *See Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) ("A settlement agreement is a contract that is interpreted according to general principles of contract law."). As a member of the *Manker* class, Doe may be able to seek relief from the *Manker* Court, which retained jurisdiction "in the event disputes arise over the implementation of the Settlement Agreement." ECF 219, at 15, *Manker v. Del Toro*, 18-cv-00372-CSH (D. Conn. Feb. 15, 2022). But he may not challenge the Secretary's alleged breach of the *Manker* settlement through this administrative appeal of the SRA's decision.

IV.    **Due Process Claim.**

Finally, Doe argues that the SRA violated his procedural due process rights under the Fifth Amendment because he failed to apply the correct legal standards, adequately explain his reasons for rejecting the Board's 2022 decision, or address Doe's evidence and arguments. "The APA sets forth no strict procedural regime for informal agency decisionmaking, and a party's procedural due process rights are respected as long as the party is afforded adequate notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Boston Redevelopment Auth.*, 838 F.3d at 50 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Doe does not dispute that he received notice and an opportunity to be heard by the SRA. Instead, Doe argues that by violating the APA, as well as applicable Navy policies and regulations, the SRA also violated his procedural due process rights. *See* ECF 35, at 19. But as the Secretary contends, an agency's violation of its own regulations and procedures does not amount to a violation of the Due Process Clause unless those procedures were constitutionally required. *See* ECF 39, at 16; *Mathews*, 424 U.S. at 334-35 (describing the three factors relevant to determining whether administrative procedures are constitutionally sufficient). Doe has not argued that any of the specific regulations or procedures that the SRA allegedly violated in this case were constitutionally required. And although Doe originally argued that he "is entitled to more process than the [SRA] provided," he has not specified what additional procedures, in his view, due process requires. ECF 26, at 20. Doe has therefore failed to establish that the SRA violated his procedural due process rights.

**CONCLUSIONS AND ORDERS**

For the foregoing reasons, Doe's motion for summary judgment, ECF 25, is GRANTED in part and DENIED in part, and the Secretary's cross-motion for summary judgment, ECF 29, is likewise GRANTED in part and DENIED in part. The SRA's February 28, 2023 decision reversing

the NDRB's decision to award Doe an Honorable discharge is VACATED, and this matter is REMANDED to the Secretary of the Navy for further proceedings consistent with this decision.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: March 26, 2025